**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DELARSE MONTGOMERY**,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>**JOSHUA GOTBAUM**, **Director,**<br>　**Pension Benefit Guaranty Corporation**,<br><br>　　　　　　Defendant. | Civil Action No. 10-cv-1223 (RLW) |

**MEMORANDUM OPINION**

Plaintiff DeLarse Montgomery ("Montgomery") brings this lawsuit against his former employer the Pension Benefit Guaranty Corporation ("PBGC"), proceeding against Joshua Gotbaum, Director of the PBGC, in his official capacity.[1] Montgomery's claims all stem from his non-selection for a GS-510-12/13 Accountant position in the Collection and Compliance Division of PBGC's Financial Operations Department. As set forth in his Complaint, Montgomery asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and the Age Discrimination of Employment Act ("ADEA"), 29 U.S.C. §§ 633a, *et seq.*, arguing that PBGC's failure to select him for the position was discriminatory on the basis of age (58 at the time), gender (male), and race (African American). He also alleges that PBGC unlawfully retaliated against him for engaging in protected activity—lodging prior complaints of discrimination against PBGC with the Equal Employment Opportunity Commission ("EEOC").

---

[1]　Montgomery initially named as defendants Hilda L. Solis, Secretary of Labor and Chair of the PBGC, and Vincent K. Snowbarger, former Executive Director of the PBGC, in their official capacities. Pursuant to Federal Rule of Civil Procedure 25(d), and with the parties' consent, Joshua Gotbaum, the present Director of the PBGC, was subsequently substituted as the defendant. (*See* Dkt. No. 18). As Director Gotbaum is named in his official capacity, the Court will refer to the defendant throughout this opinion as "PBGC" for simplicity's sake.

This matter is presently before the Court on PBGC's Motion for Summary Judgment. (Dkt. No. 34). Having carefully considered the parties' briefing and the entire record in this case, the Court concludes that the PBGC's Motion will be **GRANTED** for the reasons set forth herein.

## BACKGROUND

The Pension Benefit Guaranty Corporation is a wholly-owned United States Government corporation established by the Employee Retirement Income Security Act of 1975 (ERISA), 28 U.S.C. § 1302, to administer the pension plan termination insurance program under Title IV of ERISA, 29 U.S.C. §§ 1301-1461. PBGC is funded preliminary through the collection of premiums paid by certain types of pension plans. *Id*. at §§ 1306-07. (Dkt. No. 43-1, Joint Statement of Material Facts ("Joint Facts") at ¶ 1).[2]

On September 14, 2005, PBGC issued vacancy announcement "FODCCD-2005-006," for a GS-510-12/13 Accountant position within the Collections and Compliance Division of PBGC's Financial Operations Department. (*Id*. at ¶ 11). The vacancy announcement was posted on the PBGC Online Automated Referral System ("POLARS"), as well as the Office of Personnel Management's USA JOBS website. (*Id.*). The announcement advised that "it [was] strongly recommended that applicants submit a complete online application and electronic resume via [POLARS]." (*Id.*).

Plaintiff DeLarse Montgomery began his employment with PBGC in 1986 as a GS-5 secretary in the Financial Operations Division. (*Id.* at ¶ 2). He subsequently progressed within PBGC, ultimately becoming a GS-12 Financial Specialist in the Investment Accounting Branch.

---

[2] The facts set forth herein are drawn largely from the parties' "Joint Document of Material Facts" at Docket Entry 43-1, although the Court sometimes cites directly to evidence in the record, where appropriate.

(*Id.* at ¶ 3).  On October 5, 2005, Montgomery applied for the GS-510-12/13 Accountant position, submitting a paper copy of his application to PBGC's Human Resources Division.  (*Id.* at ¶ 14).  At the time the vacancy announcement was published, PBGC's Human Resources Department used a program called "QuickHire" to determine whether an applicant met the minimum qualifications for the position.  (*Id.* at ¶ 15).  Based on applicants' responses in the POLARS electronic system, QuickHire automatically "screened out" applicants when the software determined that the minimum qualifications for the position were not met, and it generated a list of the remaining candidates that did meet the position's qualifications.  (*Id.*).  The lists were then reviewed by Human Resources Specialists, who generated a roster of minimally-qualified applications for the Subject Matter Expert ("SME") to review.  (*Id.*).

In this case, after QuickHire conducted an initial screening of the candidates, the list of eligible applicants was forwarded to Kenneth Kofsky, the SME for the vacancy, in early November 2005.  (*Id.* at ¶ 16).  Mr. Kofsky rated the applicants and they were then placed on "Certificates of Eligibles," which were forwarded to the sole decisionmaker for the position, Robert Callahan, the Financial Program Manager for the Collections and Compliance Division.  (*Id.* at ¶¶ 16, 18).  Because Montgomery did not submit his application electronically, it appears that the QuickHire system failed to include his application on the original list of eligible applicants, which meant that his application was not initially provided to Mr. Kofsky for rating, or to Mr. Callahan for consideration.  (*Id.* at ¶¶ 16-17).  Based on the listing he did receive, Mr. Callahan proceeded to interview the candidates and initially selected Kathryn Gillis for the position, but Ms. Gillis declined the offer.[3]  (*Id.* at ¶ 18).

---

[3]   Ms. Gillis had a Bachelor of Science degree in Accounting, was in the process of completing a Master of Science in Accounting, and held a Certified Public Accountant designation.  (Joint Facts at ¶ 18).

After Ms. Gillis turned down the position, PBGC proceeded to compile a second round of candidates to be considered for the vacancy. During that timeframe, on December 13, 2005, Montgomery contacted Human Resources to inquire about the status of his application. (*Id.* at ¶ 17). Montgomery was initially informed that his application was not considered because he did not apply electronically via POLARS. (*Id.*). Nevertheless, Rick Lattimer, a Human Resources Manager, directed Jacqueline Isaac, a Human Resources Specialist, to place Montgomery's name on the second round of certificates to be sent to Mr. Callahan. (*Id.* at ¶ 19; Dkt. No. 34-3 at ECF pp. 107-113; Dkt. No. 34-10 at 33).

Thereafter, Mr. Callahan contacted Montgomery to schedule an interview, and because Montgomery was on a scheduled leave of absence at the time, Mr. Callahan offered Montgomery the option of interviewing in person or by telephone. (Joint Facts at ¶ 21.). Montgomery chose to interview by telephone; he was the only candidate who did not interview in person. (*Id.*). During the interview, Mr. Callahan recognized that Montgomery met the "minimum" educational requirements for the position, but asked if Montgomery had any intention of pursuing further education that could be beneficial to the position. (*Id.*). According to Mr. Callahan, Montgomery replied that he had no interest in pursuing additional education because he "was tired." (*Id.*; Dkt. No. 34-13 at ¶ 3).[4] In addition, although Mr. Callahan had administered an electronic writing and a Microsoft Excel exercise to the other applicants for the position, he did not ask Montgomery to complete the exercise due to his poor performance

---

[4] Montgomery argues that this fact is "flatly contradicted" by his deposition testimony, wherein he supposedly stated that he told Mr. Callahan that the reason he could not go back to school was because the cost of his blood pressure medication was prohibitive, not because he "was tired." (*See* Dkt. No. 37 ("Pl.'s Opp'n") at 9). But regardless of the reason, Montgomery does not dispute that he told Mr. Callahan he was not in a position to pursue any further education.

during the initial portions of the interview. (Joint Facts at ¶ 21.). According to Mr. Callahan's affidavit:

> [He] formulated the opinion, based on [Montgomery's] overall performance in the interview, the qualifications listed on his applications, and his specific posture in exhibiting no interest in professional growth or improvement, that Mr. Montgomery was not the best candidate for the position and in fact, made the least favorable impression among all the candidates.

(Dkt. No. 34-13 at ¶ 4).

Mr. Callahan also interviewed Rhonda Dickerson-Mack for the vacancy. (Joint Facts at ¶ 22). Ms. Mack submitted her application electronically via POLARS, but she initially received a notification that she did not qualify for the position. (*Id.*). After she contacted the Human Resources Department, PBGC determined that the QuickHire software erroneously "screened out" Ms. Mack, such that her name was also not included on the initial candidate listings forwarded to Mr. Callahan for consideration. (*Id.*). Upon discovering the issue, PBGC forwarded Ms. Mack's application to Mr. Callahan for review and consideration. (*Id.*). Thus, like Montgomery, Ms. Mack's application was also submitted to Mr. Callahan for review much later in the process than some of the other candidates. Ms. Mack possessed an Associate's Degree in Accounting, was employed by PBGC as an Accountant at the time of her application, and had prior work experience as an Operating Accounting at the GS-510-13 level with the Federal Aviation Administration from 1997 to 2005. (*Id.*; Dkt. No. 37-24 at 8-11). During his interview of Ms. Mack, Mr. Callahan administered the writing and Microsoft Excel exercise. (*Id.* at ¶ 23). Mr. Callahan ultimately selected Ms. Mack for the position. (*Id.*). Ms. Mack, like Montgomery, is African American. (Dkt. No. 37-3 at 11-12).

On January 23, 2006, Montgomery was notified that he was not chosen for the Accountant vacancy because "[a]nother candidate was selected." (Dkt. No. 37-15). On March 7, 2006, Montgomery filed a formal complaint of discrimination with the EEOC, and he

subsequently filed the instant lawsuit on July 20, 2010.  (Joint Facts at ¶¶ 25-26).  Overall, Montgomery has filed a total of four complaints with the EEOC, including the complaint that preceded the instant lawsuit.[5]  (*Id.* at ¶ 7).  Montgomery has since retired from PBGC, electing to participate in a voluntary early retirement program effective September 30, 2006.  (*Id.* at ¶ 3).

## ANALYSIS

### A. Standard of Review

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence, FED. R. CIV. P. 56(c)(1)—that the quantum of evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).  While the Court views all facts in the light most favorable to the nonmoving party in reaching that determination, *Keyes v. District of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004), the nonmoving party must nevertheless provide more than "a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252.

---

[5]  At least one of those prior complaints was ultimately litigated in the U.S. District Court for the District of Columbia.  Judge Ricardo Urbina dismissed Montgomery's claims in that case—which asserted allegations of gender, race, and age discrimination and of retaliation based on his non-selection for an Accountant vacancy at PBGC—on summary judgment.  *See Montgomery v. Chao*, 495 F. Supp. 2d 2 (D.D.C. 2007).  That decision was subsequently affirmed by the Court of Appeals in a published opinion.  *Montgomery v. Chao*, 546 F.3d 703, 705 (D.C. Cir. 2008).

**B. Montgomery's Discrimination Claims Based On Race, Sex, and Age**

Title VII forbids an employer from discriminating against any individual because of race or sex. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Title VII discrimination claims are assessed under a familiar, three-step framework. First, to establish a *prima facie* case of discrimination a plaintiff must demonstrate, by a preponderance of the evidence, that: "(1) [ ]he is a member of a protected class; (2) [ ]he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). Second, once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802-04; *Wiley*, 511 F.3d at 155. Finally, the plaintiff "must be afforded the opportunity to prove" that the employer's proffered motive "was not its true reason, but was a pretext for discrimination." *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

The Age Discrimination in Employment Act (ADEA) makes it unlawful for an employer to terminate or otherwise discriminate against an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). Like claims under Title VII, ADEA claims are evaluated pursuant to the same three-part, burden-shifting framework outlined above. *Barnette*, 453 F.3d at 515. As to both categories of claims, however, the D.C. Circuit has instructed that, once an employer provides a legitimate, non-discriminatory basis for its decision at the summary judgment stage, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, the central question for the Court to resolve is whether "the

7

employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, . . . sex, [and/or age]." *Id.*; *see also Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012).  In so doing, the Court must consider: "(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." *Czekalski v. Peters*, 475 F.3d 360, 363-64 (D.C. Cir. 2007) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).  "This boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded discriminatory motives?"  *Murray v. Gilmore*, 406 F.3d 709, 713 (D.C. Cir. 2005).

Here, since the PBGC has advanced a legitimate reason for its decision—that it simply selected a better-qualified candidate for the Accountant position—the Court proceeds directly to the ultimate question and asks whether Montgomery has adduced sufficient evidence for a reasonable jury to conclude that the PGBC's proffered reason for its decision is pretextual, and that its real motivation was discrimination based on Montgomery's race, sex, and/or age.  The Court concludes he has not.

To show pretext, a plaintiff may generally offer evidence that similarly-situated employees outside the protected class were treated "more favorably in the same factual circumstances," or "[a]lternatively, the employee may attempt to demonstrate that the employer

is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady*, 520 F.3d at 495; *see also Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008).  Under the latter approach, which Montgomery pursues here, "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.  Indeed, this Court does not sit as a "super-personnel department" that reexamines an employer's business decisions. *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999); *see also George v. Levitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (explaining that a court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive").

Montgomery attempts to establish pretext by attacking the legitimacy of PBGC's explanation for not selecting him for the Accountant position.  He principally argues that Mr. Callahan's explanations for selecting Ms. Mack (and, in turn, for not selecting Montgomery) are "inconsistent" and have "shifted" over time. (Pl.'s Opp'n at 12-16).  In turn, he contends that a jury could infer from this evidence that Mr. Callahan's explanations are pretextual and that his true motivation was discrimination—whether based on Montgomery's age, gender, and/or race. More specifically, Montgomery points out then when Mr. Callahan initially explained his decision—in his statement to the EEOC in 2007—he first indicated that the main reason he chose Ms. Mack over Montgomery was that she held a Bachelor's Degree in Accounting, while Montgomery did not. (*Id.* at 14).  In reality, Ms. Mack has an Associate's Degree in accounting, not a Bachelor's Degree. (Joint Facts at ¶ 22).  Second, during his deposition in the EEOC

proceedings, Mr. Callahan testified that he found Ms. Mack to be a better candidate because of her experience—she was an accountant and had previous accounting experience, while Mr. Montgomery did not. (Pl.'s Opp'n at 14 (citing Dkt. No. 37-19 at 65)). Finally, Montgomery points to the affidavit submitted by Mr. Callahan in connection with the instant motion, wherein he attested that he did not select Montgomery due to "his overall performance in the interview . . . and his specific posture in exhibiting no interest in professional growth or improvement." (*Id.* at 15 (citing Dkt. No. 34-13)). Pointing to these explanations, Montgomery argues that Mr. Callahan's "waffling" between reasons is sufficient evidence of pretext to withstand summary judgment. The Court disagrees.

It is true that a decision-maker's "shifting and inconsistent" explanations for an adverse employment action can be probative of pretext. *See Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (collecting cases); *Czekalski*, 475 F.3d at 367. However, the Court does not find Mr. Callahan's explanations in this case to be "inconsistent." While it is true that he did not always articulate his decision in precisely the same manner or using precisely the same words, his overarching rationale for choosing Ms. Mack over Montgomery has always remained the same—he found Ms. Mack to be the better-qualified candidate for the position. Moreover, the key issue is whether Mr. Callahan "honestly and reasonably believed" that Ms. Mack was more qualified for the position, *Brady*, 520 F.3d at 496, and Montgomery offers no evidence to undermine the legitimacy of Mr. Callahan's belief in this regard.

The Court recognizes that Mr. Callahan may have misremembered the level of Ms. Mack's accounting degree during his first explanation—recounting that she had a Bachelor's Degree, rather than an Associate's Degree—but the fact remains that Ms. Mack has a specialized degree in accounting, while Montgomery does not. Montgomery does not dispute this fact.

(Joint Facts at ¶ 22). Additionally, it bears noting that, in his initial response to the EEOC, Mr. Callahan only stated that the candidates' educational comparison was "the biggest difference," <u>not the only difference</u>. (Dkt. No. 37-3 at 13). He never contradicted that justification, but he later elaborated on his rationale during deposition proceedings, explaining that Ms. Mack's prior accounting experience—as compared to Montgomery's lack of any accounting experience—made her a better candidate for the position.[6] Finally, both of those explanations square completely with Mr. Callahan's most recent explanation, and in arguing otherwise, Montgomery omits the critical portion of the complete statement in Mr. Callahan's affidavit, wherein he stated that he did not choose Montgomery based on "his overall performance in the interview, <u>the</u>

---

[6] Montgomery goes so far as to argue that Mr. Callahan "disavowed" his earlier explanation—that Ms. Mack's education was superior to Montgomery's—during his deposition. (Pl.'s Opp'n at 14). The record does not support this assertion. Rather, the deposition passage Montgomery cites in support of this contention reveals only that his counsel <u>attempted</u> to secure this concession from Mr. Callahan, but Mr. Callahan did not agree with counsel's representation and never testified as much:

> Q:    Are you able to tell me what it was about Ms. Mack that made you think that she's a better candidate than Mr. Montgomery? It wasn't education. Right?
> A:    She had better experience. She was - - she had worked at the GS-13 level for a number of years. She was an accountant. Mr. Montgomery was - - had never been an accountant.
> Q:    But he was qualified to be an accountant, though, wasn't he? Or he wouldn't have been on the list.
> A:    True. But I had to choose the best candidate, and I chose the one that had accounting experience over the one that didn't, had a lot of accounting experience and at a higher grade level.

(Dkt. No. 37-19 at 65). While Mr. Callahan focused his response on Ms. Mack's experience, rather than her education, he did not "disavow," as Montgomery suggests, that her education played no role in his decision.

Montgomery argues that Mr. Callahan also contradicted himself by testifying, at pages 61 and 63 of his deposition transcript, that he believed both Montgomery and Ms. Mack "met the minimum [educational] qualification." (Pl.'s Opp'n at 14-15). But the excerpts Montgomery submitted from Mr. Callahan's deposition at Docket No. 37-19 do not include pages 61 or 63. (*See* Dkt. No. 37-19 (comprised of transcript pages 1, 65-66, 68, 80, 87)). Accordingly, no such testimony or evidence is before the Court. But even if the Court were to take that supposed testimony into account, the fact that Mr. Callahan testified that both candidates met the <u>minimum</u> educational qualifications certainly does contradict the explanation that he found Montgomery's qualifications—though <u>minimally</u> sufficient—to be less impressive than Ms. Mack's.

<u>qualifications listed on his application</u>, and his specific posture in exhibiting no interest in professional growth or improvement." (Dkt. No. 34-13 at ¶ 4) (emphasis added). Of course, the "qualifications listed on [Montgomery's] application"—an aspect of Mr. Callahan's decision that Montgomery conveniently omitted with opportunely-placed ellipses, (Pl.'s Opp'n at 15)—undoubtedly encompassed Montgomery's education and professional background, as compared to Ms. Mack. Therefore, the Court finds Montgomery's argument that Mr. Callahan's explanations are "shifting" or "inconsistent" to be unpersuasive. In addition, to the extent that Mr. Callahan's explanations could arguably be characterized as "inconsistent," the Court believes that any such inconsistencies are "so minor that no reasonable jury could find that [PBGC's] proffered reasons are a pretext for discrimination." *Butler v. Sebelius*, Case No. 12-5042, 2012 WL 2372867, 2012 U.S. App. LEXIS 12485 (D.C. Cir. June 19, 2012); *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("<u>Substantial</u> changes over time in the employer's proffered reason for its employment decision support a finding of pretext.") (cited with approval in *Geleta*, 645 F.3d at 413) (emphasis added); *see also Kranz v. Gray*, 842 F. Supp. 2d 13, 24 (D.D.C. 2012) (observing that "[t]his logic applies when an employer's reason for allegedly discriminatory actions changes <u>in a material way</u> throughout the stages of litigation") (emphasis added).

Montgomery also argues that Mr. Callahan's explanation is pretextual because he conducted Montgomery's interview differently from all of the other candidates—deciding not to administer the writing and Microsoft Excel exercises during the interview. He argues that, based on this distinction, a jury could infer that Mr. Callahan "had made up his mind not to select [Montgomery] even before the interview." (Pl.'s Opp'n at 16). But Mr. Callahan offered an explanation for this discrepancy—he did not administer the exercises because Montgomery

"made the least favorable impression among all the candidates" during his interview.  (Dkt. No. 34-13 at ¶ 4).  Furthermore, although Mr. Callahan testified that he already had a "pretty good idea who [he] wanted to select" by the time he interviewed Montgomery, "evidence of pre-selection is relevant only insofar as it logically supports an inference of discriminatory intent." *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 969 (D.C. Cir. 1998), *vacated on other grounds by* 527 U.S. 526 (1999); *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 310 (D.D.C. 2005) ("[P]laintiff's pre-selection claim does not advance h[is] case for pretext unless [he] produces some evidence that discrimination played a role in [the selectee's] pre-selection and thus plaintiff's non-selection.").  Even if Mr. Callahan were already leaning toward selecting Ms. Mack for the position at the time he interviewed Montgomery, Montgomery fails to point to any evidence suggesting that any such pre-selection was motivated by a discriminatory animus towards Montgomery, whether due to his age, his gender, or his race.  If anything, the record strongly suggests the opposite—that Mr. Callahan was leaning toward Ms. Mack because she was a strongly-qualified candidate for the position.

   Finally, the Court notes that Montgomery can also attempt to "avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination," such as "discriminatory statements," "other attitudes suggesting the decision maker harbors discriminatory animus," and/or other "data" concerning his protected class(es). *Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006) (internal citations omitted).  But Montgomery presents no such evidence.  Most notably, the Court observes that Montgomery expressly does <u>not</u> argue that he actually was more qualified for the Accountant position than Ms. Mack.  (*See* Pl.'s Opp'n at 15-16) ("[W]hether Ms. Mack was more qualified . . . is not the critical issue in this case.").  Instead, he has sought to establish pretext by "expos[ing] other

flaws in the employer's explanation," *Aka*, 156 F.3d at 1295—namely, that the reasoning underlying Mr. Callahan's decision has changed over time and that the veracity of that reasoning should not be credited as a result. The Court rejects that argument for the reasons stated. And the fact that Montgomery does not even attempt to argue that he was better qualified—let alone "significantly better qualified," *id.* at 1294—simply adds to the void of evidence suggesting that PBGC's decision was discriminatory. Indeed, the undisputed record before the Court amply supports the opposite conclusion—that Ms. Mack was demonstrably and objectively more qualified for the position than Montgomery. Ms. Mack holds an Associate's Degree in accounting, while Montgomery does not have any accounting degree. (Joint Facts at ¶¶ 4, 22). In addition, Ms. Mack had nearly a decade of accounting experience working for the federal government, whereas Montgomery had never been employed as an accountant and had no accounting experience. (*Id.*). These facts further undermine Montgomery's assertion that PBGC's motive was discriminatory. *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) ("[A] disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is 'great enough to be inherently indicative of discrimination'— that is, when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate.") (internal citations omitted).[7]

Therefore, the Court concludes that Montgomery fails to raise a genuine issue of material fact with respect to his age, gender, or race discrimination claims. No reasonable jury could find discrimination under these circumstances, even when viewing the evidence in the light most favorable to Montgomery. Even if the Court were to find that Montgomery created a "weak

---

[7] As our Circuit has explained, this principle is grounded in the idea that a reasonable employer would usually not select a less-qualified candidate "unless some other strong consideration, such as discrimination, enters into the picture." *Aka*, 156 F.3d at 1294.

issue of fact" as to pretext, the uncontroverted evidence of Ms. Mack's superior qualifications and experience constitutes "independent evidence that no discrimination . . . occurred." *Reeves*, 530 U.S. at 148 (citing *Aka*, 156 F.3d at 1291-92).[8]  The Court grants summary judgment on these claims in favor of PBGC.

### C. Montgomery's Retaliation Claim

Title VII also prohibits an employer from retaliating against an employee "'because he has opposed any practice' made unlawful by Title VII or 'has made a charge, testified, assisted, or participated' in a Title VII investigation or proceeding." *Steele*, 535 F.3d at 695 (quoting 42 U.S.C. § 2000e-3(a)).  Retaliation claims under Title VII are also subject to the three-part burden-shifting framework of *McDonnell Douglas*.  Thus, a plaintiff must first establish a *prima facie* case of retaliation by showing: "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citing *Wiley*, 511 F.3d at 155). Thereafter, if the plaintiff is able to satisfy the requirements of a *prima facie* case, the burden shifts back to the employer to articulate a legitimate, non-retaliatory reason for its actions. *Id.* Once the employer does so, the burden-shifting framework disappears, and "a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence, which includes not only the *prima facie* case, but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation."

---

[8] Furthermore, Montgomery's race discrimination claim is particularly undercut by the fact that Ms. Mack is also African American. *See, e.g.*, *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) ("[A] replacement within the same protected class cuts strongly against any inference of discrimination.").  And while Ms. Mack, as a younger, female employee, falls outside Montgomery's protected class with respect to his age and gender discrimination claims, this fact, without more, is woefully insufficient to raise an inference of discrimination, particularly given the Court's earlier analysis herein.

*Geleta*, 645 F.3d at 411; *see also Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

Here, even assuming that Montgomery can establish a *prima facie* case, he fails to adduce sufficient evidence to suggest that PBGC's legitimate justification for his non-selection—*i.e.*, that Ms. Mack was simply more qualified—is pretextual.[9] First, to the extent that he attacks Mr. Callahan's explanation as "false" or "shifting," the Court rejects that argument for the reasons already stated. Alternatively, Montgomery argues that the PBGC's delay in submitting his application to Mr. Callahan amounts to evidence of pretext and a retaliatory motive. (Pl.'s Opp'n at 17-18). Specifically, he argues that Ms. Isaac's involvement with his application imbued the process with retaliatory animus, given her knowledge of Montgomery's prior EEO case and her stated belief that promotions should be based on experience, not settlement agreements. (*Id.*). He also argues that Ms. Isaac was substantially involved in determining candidates' minimum qualifications for the position and purposefully delayed his inclusion on the list of candidates submitted to the selecting official. (Joint Facts at ¶ 20). PBGC disputes this proposition and maintains that Ms. Isaac's only involvement with Montgomery's application was to affirmatively place him on the candidate listing that was submitted to Mr. Callahan for review. (*Id.* at ¶¶ 19-20). This dispute is immaterial, however, because even assuming Ms. Isaac were more substantively involved in the process, the Court finds Montgomery's argument unpersuasive for several reasons. First, while Montgomery's application was delayed somewhat, so too was Ms. Mack's, and she was ultimately selected for the position nevertheless. (Joint Facts at ¶¶ 22-23). Insofar as the selectee encountered similar procedural setbacks and delay,

---

[9] In view of this conclusion, the Court need not reach PBGC's argument that Montgomery is unable establish a *prima facie* case of retaliation because Mr. Callahan was arguably unaware of any of Montgomery's prior EEO activity.

this fact strongly cuts against Montgomery's pretext argument. Second, Montgomery's argument is refuted by his own testimony, wherein he confirmed that he does not believe the delay in his application process was discriminatory or retaliatory:

> Q: So do you contend that the delay in sending your application up discriminated against you based on your race, color, sex, age or for reprisal?
> A: I did not make that allegation.
> Q: And the selectee was selected from applications that came up late; is that correct?
> A: That's correct.

(Dkt. No. 42-1 at ECF p. 2). The Court thus finds that Montgomery failed to raise a genuine issue of material fact to suggest that PBGC's proffered explanation for its decision is pretextual, nor does he otherwise present evidence sufficient to raise an inference of retaliation. In turn, the Court grants summary judgment in favor of PBGC on Montgomery's retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that PBGC's Motion for Summary Judgment must be **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

Date: February 1, 2013

ROBERT L. WILKINS
United States District Judge